Elizabeth J. VALENTE et al., Plaintiffs,

v.

PEPSICO, INC., et al., Defendants.

Civ. A. No. 4537.

United States District Court,
D. Delaware.

July 12, 1978.

Rodman Ward, Jr., and James L. Holzman, of Prickett, Ward, Burt & Sanders, Wilmington, Del., of counsel; Herbert E. Milstein and Glen DeValerio, of Kohn, Milstein & Cohen, Washington, D. C., Harold E. Kohn, of Kohn, Savett, Marion & Graf, Philadelphia, Pa., for plaintiffs.

Richard J. Abrams of Richards, Layton & Finger, Wilmington, Del., for intervening plaintiff, James G. Ryan.

Alfred M. Isaacs of Flanzer & Isaacs, Wilmington, Del., for intervening plaintiffs, George Pope and Andrew Dimitriou.

Hugh L. Corroon of Potter, Anderson & Corroon, Wilmington, Del., for defendants.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This securities class action is presently before the Court on cross-motions for summary judgment. The plaintiffs, minority holders of common shares, warrants, and debentures of Wilson Sporting Goods ("Wilson"), filed the action on December 13, 1972.[1] The defendants in the suit are Pep-

---

1. The class of plaintiffs, which was certified on August 17, 1973, consists of the owners (other than PepsiCo and the individual defendants in this case), as of July 26, 1972, of the common

siCo, Inc. ("PepsiCo"), Wilson, and twelve individuals who were PepsiCo directors and/or officers in July 1972.[2] The allegations of the complaint relate to a series of events which followed PepsiCo's acquisition of a majority interest in Wilson in February, 1970. These events culminated in tender offers by PepsiCo and Wilson for Wilson securities in July 1972 and the merger of Wilson into PepsiCo under the Delaware short form merger statute, 8 *Del.C.* § 253, in December, 1972..

In their complaint, the plaintiffs allege that the defendants violated various provisions of the Securities Exchange Act of 1934, including §§ 7(d), 9(a), 10(b), 13(a), 13(d), 14(d), and 20(a), 15 U.S.C. §§ 78g(d), 78i(a), 78j(b), 78m(a), 78m(d), 78n(d) and 78t(a); and rules 10b–5, 13d and 14d and regulation 13A of the Securities and Exchange Commission, 17 C.F.R. §§ ·240.10b–5, 240.13d, 240.14d, and 240.13a.[3] Plaintiffs further allege that defendants breached their fiduciary duty to the minority shareholders[4] of Wilson under state law. The complaint requests both injunctive relief and damages. However, the plaintiffs did not pursue the claim for injunctive relief, and the merger was accomplished on December 22, 1972. Plaintiffs have requested a jury trial.

In October, 1976, the plaintiffs filed a motion for summary judgment against the corporate defendants, PepsiCo and Wilson, based on the section 10(b) claims. This motion was addressed only to certain omissions from the tender offer materials. In December, 1976, in an attempt to clarify the facts and issues in this case, the Court

stock, warrants, or debentures of Wilson. No sub-classes were created. Notice of this action was sent to all identifiable potential members of the class. The original class representatives in this case are Elizabeth J. Valente and William D. Valente, individually and as custodians for their children. They are owners of Wilson common shares, debentures, and warrants. The Valentes retained all of these securities, except for one hundred shares of common stock, which they tendered to PepsiCo in 1976.

Four other individuals have been granted leave to intervene as party-plaintiffs. Charles R. Kemp, the owner of Wilson warrants, was permitted to intervene as a party-plaintiff on January 31, 1973. Kemp tendered his warrants pursuant to the tender offer in 1972. James G. Ryan, the owner of shares of Wilson common stock, was permitted to intervene as a party-plaintiff on October 19, 1973. He did not tender his shares. George Pope and Andrew Dimitriou were permitted to intervene as party-plaintiffs on May 14, 1975. Both Pope and Dimitriou were owners of Wilson warrants, most of which they tendered to PepsiCo following the tender offer of July 26, 1972.

2. Wilson was a Delaware corporation incorporated in April, 1967 as one of three corporations organized to succeed to the business of Wilson & Co., Inc., and those of its subsidiaries which comprised its athletic goods division.

PepsiCo is a Delaware corporation incorporated in 1919. During the time period covered by the complaint in this case, PepsiCo was engaged primarily in the following businesses: (1) manufacturing, selling, and distributing soft drink concentrate and soda; (2) manufacturing, selling and distributing snack foods; (3) interstate moving; (4) leasing; and (5) through Wilson, manufacturing and merchandising golf, tennis, baseball, football, basketball, and other athletic equipment, apparel and accessories.

Originally, there were fifteen individual defendants: Charles Allen, Jr., a director of PepsiCo; Angus S. Alston, a director of PepsiCo; Victor A. Bonamo, an officer and director of PepsiCo and a director of Wilson; George Champion, a director of PepsiCo; Donald M. Kendall, a director and officer of PepsiCo, and a director of Wilson; Bernard J. Lasker, a director of PepsiCo; Herman W. Lay, a director of PepsiCo and Wilson; Harold R. Lilley, a director and officer of PepsiCo and a director of Wilson; William B. Oliver, a director of PepsiCo; Andrall E. Pearson, a director and officer of PepsiCo, and a director of Wilson; James M. Roche, a director of PepsiCo; Herman A. Schaefer, a director and officer of PepsiCo, and a director of Wilson; Robert H. Stewart, III, a director of PepsiCo; Peter K. Warren, a director and officer of PepsiCo and a director of Wilson; and George H. Williamson, an officer of PepsiCo. Three of the original defendants, Angus S. Alston, William B. Oliver, and George Williamson, have died since the complaint was filed and have been dismissed from this action.

3. Since the filing of the complaint, the plaintiffs have abandoned Count II, the claim based on section 7(d) of the Securities Exchange Act of 1934. In addition, they have abandoned Count VIII, a derivative claim asserted on behalf of Wilson.

4. In this opinion, the term "shareholder" generally is meant to include the holders of warrants and debentures, as well as the holders of common shares, unless otherwise specified.

ordered the parties to submit statements of facts and legal contentions and authorities. The parties completed the filing of these submissions in May, 1977. At that time, the defendants filed a motion for summary judgment, apparently addressed to all claims contained in the complaint.

## I. FACTUAL BACKGROUND

At the time of its incorporation in April, 1967, Wilson was a wholly-owned subsidiary of Ling-Temco-Vought, Inc. ("LTV"). In August, 1967, Wilson offered for public sale 600,000 shares of common stock, leaving LTV with approximately 75% of the equity in Wilson. In October, 1968, Wilson issued for public sale $35 million of 6½% subordinated debentures due in 1988 and warrants to purchase 875,000 shares of Wilson common stock at an exercise price of $20.25 per Wilson common share. The issue was made in "units", each consisting of one debenture in the principal amount of $1,000, and warrants to purchase 25 shares of common stock. The offer provided that until October 15, 1973, the debentures could be used as payment for common shares at the time the warrants were exercised.

During 1969, PepsiCo became interested in acquisition in the leisure-time industry field. In early 1970, PepsiCo conducted negotiations with LTV concerning acquisition of the majority ownership in Wilson. After approximately ten days of negotiation, PepsiCo and LTV agreed on a price of $63 million, which was equivalent to about $17.50 per share of Wilson common stock.[5] On February 24, 1970, PepsiCo issued a press release which announced the agreement in principle and disclosed its intention eventually to acquire the remaining 25% publicly held interest in Wilson at a price per share equivalent to what would be paid to LTV. The press release stated that Pep-

siCo had not determined the specific form and timing of the acquisition of the remaining shares.

Following PepsiCo's acquisition of the majority interest in Wilson, its personnel assumed a substantial role in the management of Wilson, receiving detailed reports on Wilson's operations and meeting regularly with Wilson employees. PepsiCo provided management services to Wilson pursuant to a Services and Sales Contract. The majority of the members of the Wilson Board of Directors were affiliated with PepsiCo. Wilson's earnings performance, which had been unimpressive at the time of the PepsiCo acquisition, improved considerably during 1971 and 1972. During the period at issue in this case, the market price of Wilson stock fluctuated.[6]

After its initial acquisition of Wilson stock, PepsiCo considered various methods of acquiring the remainder of the outstanding shares. In December, 1970, PepsiCo received Internal Revenue Service rulings which were unfavorable to its requests concerning the tax consequences of an exchange of PepsiCo stock for Wilson stock. In January, 1971, PepsiCo issued a press release announcing its intention to acquire within two years all the outstanding Wilson common shares at a price of $17.50 per share, either for cash or for the equivalent value in PepsiCo securities, and to acquire the outstanding warrants for cash or for PepsiCo securities. The announcement also stated that PepsiCo would begin to increase its holdings by purchases of Wilson common stock in the open market from time to time at prices then prevailing and acceptable to it.

Following this announcement, PepsiCo proceeded to purchase Wilson common stock in private transactions and on the open market. In February, 1971, PepsiCo

---

5. The agreement provided for the purchase by PepsiCo of 900,000 shares of Wilson common stock; 1,500,000 shares of Wilson Class B common stock; and 60,000 shares of Wilson convertible preferred stock.

6. Prior to PepsiCo's acquisition of a majority interest in 1970, the market price of a Wilson

share was about $10.00. Immediately after PepsiCo's acquisition and the announcement of its intention to acquire the remaining shares at $17.50 each, the price of Wilson shares rose above $16.00 per share. During the following two and a half years, the price fluctuated somewhat, reaching a high of $16.875 in June, 1972.

purchased a large block of Wilson common shares which raised its ownership of Wilson shares above 80%. Through further purchases in private transactions and on the open market, PepsiCo increased its share in Wilson to 88.2% by July 26, 1972, the date of the tender offers.

In mid-1972, PepsiCo's Treasury Department prepared a technical study entitled "Wilson Preliminary Recommendation".[7] This document, dated July 11, 1972, recommended that PepsiCo and Wilson make cash tender offers for the outstanding Wilson securities. On July 26, 1972, the PepsiCo Board of Directors, pursuant to recommendations from PepsiCo management, voted to extend a tender offer for Wilson common shares at $17.50 per share and to extend a tender offer for the outstanding warrants for the purchase of Wilson stock at $3.50 per warrant. On the same day, the Wilson Board of Directors voted to extend a tender offer for Wilson's debentures at $920 per debenture. The tender materials had been prepared by Mudge, Rose, Guthrie & Alexander, PepsiCo's outside counsel, and had been reviewed by the PepsiCo legal staff.

As a result of the tender offers, PepsiCo increased its ownership of Wilson voting securities to approximately 97.4%. Following the tender offers, PepsiCo proceeded with its plans to merge Wilson into PepsiCo. Both PepsiCo and Wilson requested the firm of Lionel D. Edie & Company to conduct a valuation of the fairness of the figure of $17.50 per share to be paid in connection with the merger. On September 27, 1972, PepsiCo publicly announced its intention to complete by the end of January, 1973, its acquisition of the outstanding Wilson equity securities by means of a merger in which the remaining minority shareholders would be paid $17.50 cash per share.

On November 3, 1972, Edie & Company issued a report which concluded that the price of $17.50 cash per share was fair and reasonable to the Wilson minority shareholders. On November 16, 1972, PepsiCo and Wilson jointly announced that the merger of Wilson into PepsiCo would take place on December 22, 1972. On December 13, 1972, plaintiffs filed the present suit. The merger took place as announced on December 22, 1972. Following the merger, the minority shareholders were notified by mail of the mechanics of submitting their stock certificates in order to receive $17.50 per share and of their appraisal rights under Delaware law, 8 *Del.C.* § 262.[8]

## II. STANDARD FOR SUMMARY JUDGMENT

■ The briefs submitted by the parties have focused on the plaintiffs' contentions that there were material nondisclosures in the tender offer materials of July 26, 1972, which constituted violations of section 10(b) and rule 10b–5 and violation of defendants' fiduciary duty to the Wilson minority shareholders under state law. The present opinion will be directed only to these contentions, since the remaining claims of the complaint have not been briefed thoroughly at this time. The motions of the parties will be treated as cross-motions for partial summary judgment.

Fed.R.Civ.P. 56(c) provides that summary judgment may be granted if the material submitted to the Court shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The standard for decision on cross-motions for summary judgment has been stated by the Third Circuit:

"It is well settled that cross-motions for summary judgment do not warrant the court in granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed. *Rains v. Cascade Industries, Inc.*, 402 F.2d

---

**7.** Plaintiffs' Exhibit 1; Defendants' Exhibit E VI 12.

**8.** On June 19, 1973, the intervening plaintiff Ryan filed a petition for appraisal in the Dela-

ware Court of Chancery. The proceeding has been stayed pending a resolution of the present case.

241, 245 (3d Cir. 1968); *F. A. R. Liquidating Corp. v. Brownell,* 209 F.2d 375, 380 (3d Cir. 1954). . . . The party who moves for summary judgment has the burden of demonstrating that there is no genuine issue of fact. . . ."

*Manetas v. International Petroleum Carriers, Inc.,* 541 F.2d 408, 412 (3d Cir. 1976). *See also, Hayes v. City of Wilmington,* 451 F.Supp. 696 at 706–707 (D.Del.1978). Thus, if there are disputed matters of fact relating to any of the elements of liability in this case, the Court must conclude that summary judgment would be inappropriate. However, if there is no genuine issue of material fact relating to the elements of liability in connection with any of the alleged omissions, then summary judgment as to those omissions is proper.[9]

### III. ELEMENTS OF A PRIVATE ACTION UNDER SECTION 10(b) AND RULE 10b–5

In order to make out a private cause of action for damages for violation of section 10(b) and rule 10b–5, a plaintiff must prove certain elements. The violation must be in connection with the purchase or sale of a security. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The alleged misrepresentations or omissions must be material. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 407–408 (3d Cir. 1974). There must be a causal relationship between the alleged violation and the alleged injury. *Affiliated Ute, supra,* 406 U.S. at 154, 92 S.Ct. 1456; *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 239 (2d Cir. 1974); *Halle & Stieglitz v. Empress International, Ltd.,* 442 F.Supp. 217, 223 (D.Del.1977). Further-

more, a defendant must act with some form of scienter, above and beyond mere negligence. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

### A. The "In Connection With" Requirement

In order to state a claim under section 10(b), there must be an alleged violation which is "in connection with" the purchase or sale of a security. *Blue Chip Stamps, supra.* In order to meet this requirement, the deceptive practice must "touch", and exist in reasonably close proximity to, the purchase or sale. *See, Superintendent of Life Insurance v. Bankers Life and Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Ketchum v. Green,* 557 F.2d 1022 (3d Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977); *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187 (3d Cir. 1976).

In the present case, most of the plaintiffs engaged in the "sale" of securities. Shareholders who were confronted with the allegedly deceptive tender offer materials were faced with the choice of either tendering their securities or holding them until the time of the anticipated merger. A shareholder who tenders his shares and whose tender is taken up by the offeror is a seller. *See, e. g., Bound Brook Water Co. v. Jaffe,* 284 F.Supp. 702, 709 (D.N.J.1968); 2 A. Bromberg *Securities Law; Fraud* § 6.3 (1021) at 122.17 (1977) (hereinafter "Bromberg"). A shareholder who retains his shares at the time of a tender offer, but who is required at the time of a subsequent short form merger either to surrender them in exchange for cash or to request appraisal, is a "forced seller". *Vine v. Beneficial Finance Co.,* 374

---

**9.** At the time the parties submitted their respective statements of facts and legal contentions, the defendants denied most of the factual paragraphs set out by the plaintiffs. However, most of these denials appear to be objections to the manner in which the facts were stated, rather than objections to their substance. In fact, some of the denials appear to be frivolous and contrary to the spirit of the Court's order.

Defendants have acknowledged in their briefs that there is no genuine issue of material fact as to most of the issues in this case. There is apparently basic agreement about what was contained in the tender offer materials, the events leading up to the tender offers and merger, and the relationship between Wilson and PepsiCo.

F.2d 627, 633–636 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). *See also, Voege v. American Sumatra Tobacco Corp.,* 241 F.Supp. 369, 374 (D.Del. 1965).[10]

■ The alleged omissions occurred "in connection with" these sales. The tender materials clearly were issued in connection with the tender offers and the resulting tender by shareholders of their common shares, warrants, and debentures. In addition, both the tender offers and the merger in this case were part of a plan, referred to in PepsiCo press releases and the tender materials, by which PepsiCo was to acquire 100% of the Wilson stock. The tender offers and the merger took place within several months of each other. PepsiCo was enabled to execute a short form merger as a result of the successful outcome of the tender offers, which gave PepsiCo over 90% of the Wilson stock. In light of these facts,

---

10. The "forced seller" doctrine applies to the nontendering holders of common shares, since at the time of the merger, they were faced with the alternatives of retaining shares in a nonexistent corporation or receiving cash at the time of the merger or in an appraisal proceeding. *See, Vine, supra,* 374 F.2d at 634. The doctrine presumably extends also to the nontendering warrant holders, who were left with either the right to purchase shares in a nonexistent corporation or the right to receive cash. However, the nontendering debenture holders do not appear to have standing as "forced sellers". These holders apparently retained their Wilson debentures with no change in the terms of the debentures, except that PepsiCo assumed Wilson's obligations under the indenture agreement. A letter sent to the Wilson debenture holders prior to the merger stated:

> The terms of the merger announced by PepsiCo, Inc., which the Board of Directors of the Company has approved, provide for the assumption of these Debentures as subordinated obligations of PepsiCo, Inc., with all other terms and conditions, including repayment, remaining the same.

Defendants' Exhibit B IV 7.

The situation of the nontendering debenture holders in this case is distinguishable from that of the common shareholders in *Vine* in several respects. The debentures were debt securities with repayment and redemption terms which presumably could be met by any solvent obligor, as opposed to equity securities which represented a share in a particular enterprise. The debenture holders were not required to accept a new form of consideration, such as cash.

The one feature of the debentures which was lost in the merger was the ability of the holders to use the debentures as payment in conjunction with exercise of the warrants to purchase Wilson stock. (In fact, perhaps this could more accurately be termed a feature of the warrants). However, the debenture holders who also owned warrants would have standing as sellers by virtue of their surrender of warrants at the time of the tender offers or merger.

Unlike the shareholders in *Vine,* the debenture holders were not left with shares in a nonexistent corporation. Instead, the obligations accompanying the debentures were assumed by an ongoing, solvent corporation through the execution of a supplemental indenture. Compare the case of shareholders who complain about issuance of new shares or a plan of recapitalization. Even though those shareholders may allege that their shares have been diluted or otherwise fundamentally changed, the courts generally have held that there is no "sale" in such a situation, since the plaintiffs continue to hold shares in an ongoing enterprise. *See, e. g., Sargent v. Genesco, Inc.,* 492 F.2d 750, 764–765 (5th Cir. 1974); *Schnorbach v. Fuqua,* 70 F.R.D. 424, 438–439 (S.D.Ga. 1975); *In re Penn Central Securities Litigation,* 367 F.Supp. 1158, 1172–74 (E.D.Pa.1973); *In re Penn Central Securities Litigation,* 347 F.Supp. 1327, 1338–39 (E.D.Pa.1972), *modified,* 357 F.Supp. 869 (E.D.Pa.1973), *aff'd.,* 494 F.2d 528 (3d Cir. 1974).

Virtually all of the "forced seller" cases have dealt with equity securities. At least one court has suggested that the thrust of the "forced seller" doctrine is that a sale occurs when there is a fundamental change in the nature of an investment from an interest in a going enterprise into the right solely to payment of money for shares. *See, Dudley v. Southeastern Factor and Finance Corp.,* 446 F.2d 303, 307 (5th Cir.), *cert. denied,* 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971). *Cf., S.E.C. v. National Securities, Inc.,* 393 U.S. 453, 467, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). In this case, the nature of the debenture holders' investment remained virtually unchanged after the merger. While the identity of the obligor may have some significance in certain situations, the Court believes that in this case, the assumption of the Wilson debenture obligations by PepsiCo was not a great enough change in the nature of the debenture holders' investment to constitute a "sale" for the purposes of section 10(b).

Alternatively, even if the assumption of the debenture obligations by PepsiCo were characterized as a sale, it is not clear that the nontendering debenture holders can allege that they were injured in any way as a result of the tender offers and merger.

the alleged omissions in the tender materials can be said to "touch", and exist in reasonably close proximity to, the "forced" sale by the holders of common shares and warrants at the time of the merger. For the reasons indicated in note 10, *supra,* the Court concludes that there was no sale by the nontendering debenture holders.

## B. Materiality

The standard for materiality in securities cases has been set out by the Supreme Court in *TSC Industries, Inc. v. Northway,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976):

> "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard . . . does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

*Id.* at 449, 96 S.Ct. at 2132.[11] The Supreme Court cautioned in *Northway* that the issue of materiality is a question of mixed law and fact which will frequently be appropriate for determination by the trier of fact:

> "In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."

*Id.* at 450, 96 S.Ct. at 2133. In *Northway,* the Supreme Court reversed the finding of the Court of Appeals that certain omissions were misleading as a matter of law and remanded, concluding that none of the facts omitted were so obviously important that reasonable minds could not differ on their materiality and thus that Northway was not entitled to partial summary judgment.

The Court in *Northway* left some limited room for a court to find an omission to be material as a matter of law. The Court stated:

> "Only if the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law' by summary judgment."

*Id.*[12] This statement suggests that a court should be cautious in taking a question of materiality away from the trier of fact (in this case, the jury) by finding that an omission is material or not material as a matter of law.[13] However, if the Court concludes

---

11. While the *Northway* case concerned omissions from proxy materials alleged to constitute a violation of rule 14a–9, the standard for materiality set out therein subsequently has been applied in section 10(b) cases. *See, e. g., Joyce, et al. v. Joyce Beverages, Inc., et al.,* 571 F.2d 703, 707 n. 6 (2d Cir. 1978); *Goldberg v. Meridor,* 567 F.2d 209, 218 (2d Cir. 1977); *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1040 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977). The *Northway* standard of materiality is similar to that previously adopted by the Third Circuit for section 10(b) cases, *see, Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 408 (3d Cir. 1974).

12. For example, the Court suggested that if the proxy statement in that case had failed to reveal National's 34% stock interest in TSC and the presence of five National nominees on TSC's board, those omissions would have rendered the statement materially misleading as a matter of law, since such facts were so obviously suggestive of control or influence. *Northway, supra,* at 453–454 n. 15, 96 S.Ct. 2126.

13. *See, e. g., Evmar Oil Corp. v. Getty Oil Co.,* Fed.Sec.L.Rep. (CCH) ¶ 96,358 (C.D.Cal., March 17, 1978), in which the court was unable to conclude as a matter of law that a proxy

that reasonable minds could not differ as to the importance of an omitted fact to an investor's decision, the Court may find materiality or lack of it as a matter of law.

The plaintiffs allege that defendants omitted, *inter alia,* the following items of information from the tender materials: (1) that minority shareholders would have appraisal rights under Delaware law at the time of the subsequent merger;[14] (2) facts indicating the extent of PepsiCo's control over Wilson's operations and board of directors; (3) the redemption price for the debentures; (4) the increase in value of Wilson since its acquisition by PepsiCo in 1970; (5) the "premium" paid to the option holders for relinquishing their options to purchase Wilson stock; (6) PepsiCo's plans for the disposition of Wilson's interest in Larson Industries;[15] (7) the tax benefits to PepsiCo resulting from its merger with Wilson; and (8) the effect of PepsiCo's public announcements on the value of Wilson securities. In order to determine whether the materiality of the alleged omissions can be determined as a matter of law, the Court will examine each omission individually.

### 1. Appraisal Rights in Connection with Subsequent Merger

■ PepsiCo disclosed in the tender offer materials its intention to liquidate Wilson by means of a merger in the following terms:

"PepsiCo is making this tender offer as a part of its previously announced intention to acquire 100% of the outstanding equity securities of Wilson by not later than the end of January, 1973. Subject to its assessment of the results of this tender offer and to certain other factors it deems relevant, PepsiCo presently intends to liquidate the present Wilson by means of a merger in which the consideration paid to the remaining holders of the then outstanding Common Stock of Wilson would be $17.50 cash per Share." However, the tender materials omitted any notice to the minority shareholders that they might be entitled to appraisal rights at the time of the merger which was to follow the tender offers. The Court concludes as a matter of law that, under the circumstances of the present case, the failure to disclose in the tender materials the availability of appraisal rights in the proposed merger is a material omission.

The tender materials themselves, internal PepsiCo documents, and a series of PepsiCo press releases indicate that at the time of the tender offers, PepsiCo had firm plans to merge Wilson into itself, and that the merger would occur soon after completion of the tender offers. PepsiCo announced in advance the price which it planned to offer in connection with the merger, rather than leaving the figure to be determined at the time of the merger. Thus, holders of Wilson common shares who read the tender materials must have become aware of the probability that if they did not tender their shares, they would soon face the consequences of a merger in which they would be offered $17.50 per share. Practically speaking, the minority shareholders had at least three alternatives regarding reimbursement for their shares: (1) they could tender their shares and receive $17.50 per share; (2) they could refuse to tender their shares and subsequently receive $17.50 at the time of the intended merger; (3) they could refuse to tender their shares and subsequently institute an appraisal proceeding in state court following the intended merger.[16]

statement did not omit to state material facts. The court pointed out that "even though the underlying facts may be clear, the ultimate resolution of the question of materiality requires a delicate assessment of the inferences a 'reasonable shareholder' would draw from these facts, and the significance of these inferences to him." *Id.* at 93,229.

14. This allegation is contained in the amendment to the complaint, filed February 22, 1973.

15. This allegation is contained in the amendment to the complaint, filed February 22, 1973.

16. Defendants suggest in their briefs that at the time of the tender offers, they had not made a final decision to effect a short form merger. They suggest that they might have chosen another method of proceeding in which minority shareholders would not have had appraisal rights. Thus, defendants argue, it would have been misleading to inform the minority share-

However, the tender materials informed the shareholders only of the first two alternatives.[17]

The omitted alternative, an appraisal proceeding, is one which would be of importance to most reasonable shareholders. It is the only alternative which gave shareholders any chance to receive a price greater than the $17.50 which PepsiCo offered. This alternative would be of considerable importance in the decision of any shareholder who believed, rightly or wrongly, that his shares were worth more than $17.50.[18] The Court finds that reasonable minds could not differ on the conclusion that, under the circumstances of this case, a reasonable shareholder would consider the appraisal alternative important in deciding whether or not to tender his shares.

■ Furthermore, the wording of the tender materials is actually misleading to a reasonable shareholder. Taken alone, the statement that PepsiCo intended to merge Wilson into itself, at which time the remaining holders of common shares would receive $17.50 per share, would lead a reasonable shareholder to infer wrongly that the only two alternatives open to him were to tender his shares for $17.50 per share, or to receive the same amount at the time of the merger. In other words, the shareholder appeared to be faced with the choice of "$17.50 now or $17.50 later". It was necessary to disclose the existence of a third alternative, the possibility of appraisal, in order to make the statements made in the tender materials not misleading.[19]

holders in the tender materials that they would be able to invoke a appraisal remedy at a later time. *See,* Defendants' Opening Brief, p. 79.

The Court concludes that internal documents of PepsiCo and the circumstances surrounding the tender offers, including the considerations stated in the documents presented to the PepsiCo Board and the expectation that PepsiCo would obtain more than 90% of the Wilson shares as a result of the tender offers, made it probable at the time of the tender offers that PepsiCo would choose to execute a merger under which dissenters would have appraisal rights. *See,* Defendants' Exhibits E VI 12, 13. The probability was sufficiently high at the time of the tender offers that appraisal should be regarded as a major alternative open to the minority shareholders. Any doubt about the availability of the appraisal alternative could have been expressed through qualifying language in the tender materials.

17. Defendants argue that shareholders should have been on notice of their statutory appraisal rights. The Court concludes that statutory appraisal rights are not so frequently invoked nor so familiar that a reasonable shareholder could be deemed to be conscious of their existence, at least in the circumstances of this case. Even among those who knew about appraisal rights, the wording of the tender materials may have created the impression that the rights would be unavailable in this case. *See,* text *infra.*

18. During oral argument, defendants' counsel suggested that appraisal might not be a practical alternative, since it entails an expensive and time-consuming state court proceeding. Obviously, some shareholders believe that appraisal is worth the time and expense, since the remedy continues to be invoked. In any event, the decision as to the desirability of invoking ap-

praisal rights must be left to the shareholders. Shareholders could be referred to other sources of information, such as the text of the appraisal statute and advice of counsel, for details pertaining to mechanics and drawbacks of an appraisal proceeding. In order to be found material, it is not necessary that a piece of information be dispositive of a shareholder's decision. *See, Northway, supra,* 426 U.S. at 444, 96 S.Ct. 2126.

19. Rule 10b–5 provides that omissions are actionable if they are "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading". The defendants argue that they disclosed all of the information which is required in connection with tender offers under rule 14d–1, and that since none of the statements which they made in the tender offer materials was false or misleading, there was no obligation to disclose further information. To support their reading of the language of rule 10b–5, defendants cite several cases interpreting similar language in rule 14a–9, relating to omissions from proxy statements. *See, Ash v. Brunswick Corp.,* 405 F.Supp. 234 (D.Del. 1975); *Perelman v. PREIT,* 432 F.Supp. 1298 (E.D.Pa.1977); *Shapiro v. Belmont Industries, Inc.,* 438 F.Supp. 284 (E.D.Pa.1977).

As the discussion in the text indicates, the Court disagrees with defendants in their conclusion that any statements which they made in the tender materials were not misleading. Furthermore, the Court believes that the words of rule 10b–5 and the cases cited by defendants do not mandate acceptance of their position. In light of the spirit of the federal securities laws, the words "necessary in order to make the statements made . . . . not misleading"

## 2. PepsiCo's Control over Wilson

Plaintiffs argue that the tender offer materials should have disclosed facts indicating the extent of PepsiCo's control over Wilson. They acknowledge that the tender materials revealed that PepsiCo owned 88.2% of the Wilson stock and that PepsiCo previously had formed the intent of acquiring 100% of the Wilson stock. However, plaintiffs argue, such disclosures do not reveal the extent to which PepsiCo controlled every aspect of Wilson's corporate existence. Plaintiffs argue that the tender materials should have included further facts, such as the existence of interlocking directorates which gave PepsiCo control of the Wilson Board of Directors, the fact that PepsiCo's attorneys provided all legal advice to Wilson, PepsiCo's control over the amount and terms of any Wilson borrowing and Wilson capital expenditures, and PepsiCo's control over Wilson's financial planning and marketing decisions.

■ Facts which indicate control and conflict of interest may be material, since such facts cause shareholders to scrutinize a proposal more carefully than usual. The Supreme Court recognized in *Mills v. Electric Auto-Lite*, 396 U.S. 375, 384 n. 6, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), that adequate disclosure of a serious conflict of interest on the part of directors would warn shareholders to give more careful scrutiny to the terms of a merger than they might give to one recommended by a disinterested board. *See also, TSC Industries, Inc. v. Northway, supra,* 426 U.S. at 452, 96 S.Ct. 2126. Similar considerations apply to a tender offer extended by a controlling shareholder. In *Northway, supra* at 453–454 n. 15, 96 S.Ct. 2126, the Court suggested that, at least in situations where the existence of control was uncertain, it might be necessary to disclose the existence of interlocking directorates and the fact that a shareholder owned 34% of a corporation's stock, since such facts would be indicative of control. *See,* note 12, *supra.*

■ It is possible that disclosure of the details of PepsiCo's control over Wilson might have caused reasonable shareholders to scrutinize the tender offers more carefully. Thus, it would be impossible to conclude as a matter of law that this information was not material. Neither can the Court hold as a matter of law that such information was material. The minority shareholders knew from the tender materials that PepsiCo owned a large majority of the Wilson shares and that PepsiCo had plans to liquidate Wilson by means of a merger. A reasonable shareholder might conclude that in such a situation it would be normal for a parent corporation to exercise extensive control over its subsidiary, and that the tender offers thus should be scrutinized carefully. Whether the details of PepsiCo's control over Wilson, beyond what was disclosed in the tender materials, would have been important in a reasonable shareholder's decision whether to accept the tender offers is a matter which is more

should be read broadly, in order to assure that investors will not be deprived of essential information. *See, Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Supt. of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *SEC v. Capital Gains Bureau,* 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). Even when all information specifically required by SEC rules and regulations is disclosed accurately in a tender offer, a document as a whole may be misleading in its effect. There is no requirement under rule 10b–5 that there be a one-to-one correspondence between an alleged omission and a particular affirmative statement in a document. *See, Evmar Oil Corp. v. Getty Oil Co.,* Fed.Sec. L.Rep. (CCH) ¶ 96,358 at 93,228 n. 3 (C.D.Cal.,

March 17, 1978). Furthermore, a facially accurate statement may suggest certain conclusions, which suggestion would be misleading without further disclosures. *See, e. g., Lyman v. Standard Brands, Inc.,* 364 F.Supp. 794 (E.D. Pa.1973). Finally, as the words of rule 10b–5 suggest, surrounding circumstances may cause certain disclosures to be necessary when they might not otherwise be required.

Several courts have held that it may be misleading to inform shareholders of certain results, or alternatives open to them, while omitting any reference to other results or alternatives. *See, e. g., Joyce v. Joyce Beverages, Inc.,* 571 F.2d 703, 707 (2d Cir. 1978); *Weeks Dredging & Contracting, Inc. v. American Dredging Co.,* 451 F.Supp. 468 at 480 (E.D.Pa.1978).

appropriate for resolution by the trier of fact.

Furthermore, a reasonable shareholder might have known of the extent of Pepsi-Co's control over Wilson from the prior annual shareholder reports. These annual reports listed the Wilson directors and their affiliations and disclosed the existence of the Services and Sales Contract, under which PepsiCo provided management services to Wilson. Several courts have held that disclosure of certain facts in a particular document may be unnecessary if those facts are adequately disclosed in the "total mix" of information available to shareholders. Thus, courts may find that shareholders are "presumably aware" of certain facts, as a result of prior public dissemination of those facts. *See, e. g., Spielman v. General Host,* 538 F.2d 39, 41 (2d Cir. 1976); *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 606 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974); *Gulf & Western Industries, Inc. v. Great A. & P. Tea Co., Inc.,* 356 F.Supp. 1066, 1071 (S.D.N.Y.), *aff'd,* 476 F.2d 687 (2d Cir. 1973).

However, it is impossible to conclude as a matter of law that prior disclosure was sufficient to inform a reasonable shareholder of the extent of PepsiCo's control over Wilson. Many of the details of control were never disclosed in the annual reports, and those facts which were disclosed were not always prominently displayed.[20] The annual reports were received by the share-holders months or years before the tender offers. The Court concludes that the effect of prior disclosure on the mind of a reasonable shareholder is more appropriately to be determined by the trier of fact.[21]

### 3. Redemption Prices for Debentures

■ On the same day PepsiCo made tender offers for the Wilson common shares and warrants, Wilson itself made a tender offer for its own debentures at a price of $920.00 per debenture. The debentures had been issued in 1968, and had a maturity date of October 15, 1988. The indenture agreement included a schedule of prices which Wilson would have been obligated to pay if it chose to redeem the debentures prior to their maturity date. If Wilson had chosen to redeem the debentures on July 26, 1972, the date of the tender offer, it would have been obligated to pay a redemption price of $1,054.50 per debenture.

Plaintiffs argue that Wilson should have disclosed in the tender materials the redemption price of $1,054.50 per debenture.[22] Plaintiffs presumably believe that knowledge of a redemption price higher than the tender offer price would have helped the debenture holders to evaluate the fairness of the tender offer price.

There are several flaws in this argument. A debenture holder cannot force a corporation to redeem his debentures before they come due. Thus, redemption was not a practical alternative to acceptance of the

---

**20.** For example, the list of directors and their affiliations appears to have been placed at the end of the annual reports.

**21.** The tender materials for the debentures differ from the other tender materials in that they do not reveal that PepsiCo owned 88.2% of the voting stock of Wilson. While Wilson, rather than PepsiCo, made the tender offer for the debentures, the offer was part of PepsiCo's over-all plan to acquire Wilson securities. Disclosure of PepsiCo's control of Wilson would have alerted debenture holders to scrutinize the tender offer carefully, whether it was made by Wilson or by PepsiCo.

Some of the language in *Mills, supra,* and *Northway, supra,* suggests that omission of any reference to control in proxy statements might be material as a matter of law. The same presumably would be true of a tender offer made in order to carry out the plan of a controlling shareholder, since knowledge of the control relationship might prompt the offeree to scrutinize more carefully the adequacy of the tender price. However, there remains the question of what effect the prior disclosures in the annual reports had on the debenture holders. In light of this uncertainty, the materiality of PepsiCo's ownership of Wilson stock to the decision of the reasonable debenture holder cannot be determined as a matter of law.

**22.** The schedule of redemption prices was contained in the indenture agreement, and possibly on the reverse side of the debentures themselves, although the record is not clear on this matter.

tender offer, unless Wilson chose to redeem the debentures. The Court has found no indication in the record that Wilson was prepared to do so. Furthermore, the market value of a debenture presumably is determined by a variety of factors, such as the prevailing interest rate, and is affected only slightly by redemption prices.

In light of these considerations, the Court concludes that a reasonable debenture holder would not have considered the redemption price important in his decision whether or not to tender. Since the Court finds that reasonable persons could not differ as to this conclusion, as a matter of law, Wilson was not obligated to disclose the redemption price of the debentures in the tender materials.[23]

### 4. Improvement in Wilson's Earnings Performance

During the period between Pepsi-Co's acquisition of a majority interest in Wilson in 1970 and the time of the merger in 1972, Wilson's financial performance improved significantly. Wilson's earnings figures reflected a loss of 76 cents per share in 1970, but earnings per share (EPS) rose to 97 cents in 1971 and $1.22 in 1972.

Plaintiffs argue that these figures should have been disclosed in the tender offer materials, since they were indications that the inherent value of Wilson stock had risen since February, 1970. Presumably, the shareholders might conclude from that information that Wilson stock should be worth more in 1972 than the $17.50 per share which PepsiCo had paid to LTV in 1970.

Several courts have held that there is no obligation to disclose financial data, such as earnings per share, which are readily available in financial reports. In *Arber v. Essex Wire Corp.*, 490 F.2d 414 (6th Cir.), *cert. denied*, 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974), the court held that a buyer was not obligated to inform a seller of financial data such as earnings per share or book value. The court stated:

"We hold that an insider has no affirmative duty to direct a seller's attention to all routine data commonly found in the statements and books of the corporation, at least where that information is readily available; the outsider has knowledge that it is available and made no inquiry; and the information thus available is not of an unusual or extraordinary nature."

*Id.* at 420. *See also, Gulf & Western Industries, Inc., supra*, 356 F.Supp. 1066 (tender offeror was not obligated to disclose market price of the target corporation's stock and fact that target's dividends had been declining and that it had been losing money, since such information was available to the ordinary investor through the company's annual or quarterly statements or through papers of general circulation).

This Court agrees with the conclusion of the courts in *Arber* and *Gulf & Western* that readily available financial information about a company need not be disclosed in a tender offer. The improvements in Wilson earnings were highlighted in Wilson's annual and quarterly reports, and appeared on the financial pages of major newspapers from time to time. Common sense suggests that the minority shareholders would have known about the improved EPS figures, or at least would have checked them before making a decision whether or not to tender. As a matter of law, PepsiCo and Wilson were not required to disclose the improved financial performance of Wilson in the tender offer materials.

### 5. Treatment of Stock Options

In 1967, Wilson established a Qualified Stock Option Plan (the "1967 Plan") for key employees. At the same time, Wilson assumed an existing stock option plan established by LTV (the "Assumed Plan"). Under the 1967 Plan, the option price was $10.00 per share, and under the Assumed Plan, the option price was $8.58 per share (after adjustment for a stock split which occurred in 1968). Under the Internal Rev-

---

**23.** Plaintiffs did not include in their complaint the claim that Wilson failed to disclose the redemption price of the debentures, but did raise the claim in their briefs.

enue Code, a Wilson employee who owned Wilson stock acquired through exercise of an option was required to hold the stock for at least three years in order to receive capital gains treatment on the "spread" between the exercise price and the market price. In order to qualify for long-term capital gain treatment on any gain in excess of the spread, the employee was required to hold the stock longer than six months.

During 1970, several officers of Wilson and PepsiCo became concerned about the effect on the option holders of PepsiCo's plan to merge Wilson into it. Because of the anticipated liquidation of Wilson, some option holders would have been unable to hold their Wilson stock for the statutory three year minimum, and thus would have been deprived of anticipated tax benefits. In order to avoid morale problems caused by the uncertainty and possible penalty to the employee/option holders, Wilson made an offer to cancel all unexercised options in consideration of payment in the per share amount of 120% of the difference between the option exercise price and $17.50. The option holders were given the opportunity to receive this payment in two installments, one paid in 1971 and the other paid in 1972.[24] The Wilson Board believed that the extra 20% was necessary in order to compensate the option holders for the loss of capital gains treatment which they would suffer by surrendering their options. All of the Wilson option holders accepted this offer of cash compensation in return for allowing their options to lapse.

Plaintiffs assert that the payment to the option holders included a premium of 20% of the spread, while other shareholders received no such premium. They argue that payment of the premium should have been disclosed in the tender materials, since knowledge of this unequal treatment would have alerted the minority shareholders that their shares might have been worth more than the tender offer price.

Payment of a premium to one group of shareholders in order to induce them to exchange their stock and thus assure the success of a merger may be a material fact which is of great interest to shareholders. *See, Gould v. American-Hawaiian S. S. Co.*, 535 F.2d 761, 771 (3d Cir. 1976). Since the payment of a premium may indicate that the value of the stock is greater than the price being offered to other shareholders, such information generally should be disclosed. However, in the present case, there is no dispute that the purpose of paying the "premium" was to compensate employees for loss of their anticipated tax benefits and thus improve employee morale. The amount of the premium had no apparent relationship to the value of the stock, but only to the loss of tax benefits which were unique to the special class of option holders.

In light of the purpose of the "premium" in this case, it is unlikely that knowledge of the premium would have been important in a reasonable shareholder's decision as to whether or not to tender his shares. However, it is not inconceivable that a reasonable shareholder might have considered the payments to the option holders to be unfair preferential treatment, which should have been matched by an increase in the tender offer price, and that such a consideration might have assumed importance in his decision.[25] Since the Court concludes that reasonable minds could differ as to the materi-

---

24. Payment to the option holders thus was made during the year in which the tender offers were extended.

25. For example, the minority shareholders could have concluded that PepsiCo should share the tax benefits which it would receive in the subsequent merger, in the same way in which it had shared tax benefits with the option holders. In a memorandum from H. Luppescu (PepsiCo's vice president for tax admin- istration) to Mr. A. E. Pearson (President of PepsiCo), dated May 12, 1970, Luppescu suggests that one of the bases on which optionees could be indemnified for loss of their tax benefits would be: "Since Wilson would receive a tax benefit to the extent that the individuals are taxed on the basis of ordinary income, this benefit could be shared in an appropriate manner with the individuals concerned."

ality of the "premium", the question is more properly one for the jury.[26]

### 6. Plans for Sale of Wilson's Interest in Larson Industries

Wilson sold its 36% interest in Larson Industries, a manufacturer of boats and hockey and ski equipment, on December 21, 1972, one day prior to the merger of Wilson and PepsiCo. Plaintiffs allege that defendants should have disclosed in the tender offer materials their intention to cause Wilson to dispose of its interest in Larson, the effect such a disposition would have had on the value of Wilson stock, and the tax benefits which PepsiCo would obtain from the disposition.

The Court concludes that the question of the materiality of PepsiCo's plans with respect to Larson is not appropriate for summary judgment. Plaintiffs claim that the decision to dispose of the Larson interest was firm at the time of the tender offer, while defendants deny that there was any such firm intent.[27] In addition, it is unclear how great an effect the Larson disposition would have had on the value of Wilson stock, and whether that effect would have been positive or negative. Even if there had been a firm decision to dispose of the Larson interest within five months of the tender offer, it is uncertain how important a reasonable shareholder would have considered this information. These matters should be resolved by the trier of fact.

### 7. Benefits to PepsiCo from Merger with Wilson

Plaintiffs allege that defendants should have disclosed in the tender materi-als the tax benefits which PepsiCo would receive as a result of the timing of the tender offer and the merger with Wilson. Disclosure of the benefits a controlling shareholder will gain from an amalgamation or merger may be necessary in certain cases. *See, e. g., Kohn v. American Metal Climax,* 458 F.2d 255, 265 (3d Cir.), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972). Disclosure of such benefits presumably prompts shareholders to give closer scrutiny to the transaction.

However, shareholders may be aware that a corporation which merges another into itself usually derives some benefits therefrom, including tax benefits. It is unclear from the present record whether the benefits which PepsiCo was to receive were unusual in nature, or whether the minority shareholders would realize their existence. The Court concludes that reasonable minds could differ as to whether details of the benefits which PepsiCo would receive would be important in a reasonable shareholder's decision whether or not to tender his shares. The question is more properly left to the trier of fact.

### 8. Effect of PepsiCo Announcements

From the time of its acquisition from LTV of the majority interest in Wilson, PepsiCo issued public announcements stating that it planned eventually to acquire 100% of Wilson shares at the same price paid to LTV approximately $17.50 per share. Plaintiffs allege that these announcements had the effect of placing a ceiling on the market price of the Wilson shares, and that PepsiCo should have disclosed this effect in the tender offer materi-als.

---

**26.** Defendants have suggested that information on the offer to option holders was contained in proxy statements and annual reports of Wilson. The Court has examined these documents and concludes that they do not constitute adequate disclosure of the amount and purpose of the "premium" paid to the option holders. Furthermore, the information is not prominently displayed in the documents, which were issued months, and even more than a year, before the tender offers. Such "buried facts" cannot constitute adequate disclosure. *See, e. g., Blanchette v. Providence & Worcester Co.,*

428 F.Supp. 347, 353 (D.Del.1977); *National Home Products, Inc. v. Gray,* 416 F.Supp. 1293, 1315–1316 (D.Del.1976); *Gould v. American-Hawaiian Steamship Co.,* 331 F.Supp. 981, 995–6 (D.Del.1971), *aff'd in relevant part,* 535 F.2d 761, 774 (3d Cir. 1976).

Plaintiffs did not include in their complaint the claim that defendants failed to disclose the "premium" paid to option holders. If plaintiffs intend to pursue this claim, they should move to amend their complaint to include it.

**27.** *See,* Plaintiffs' Opening Brief, p. 20; Defendants' Opening Brief, p. 81.

This matter is inappropriate for decision on summary judgment. There is a factual dispute as to whether the PepsiCo announcements actually did place a ceiling on the market price of Wilson shares.[28] Depending on the outcome of this factual dispute, there may or may not be a need then to determine the materiality of the omission.[29]

## C. Causation [30]

Defendants argue that plaintiffs are unable to prove a causal connection between the alleged violations and the alleged injuries in the present case, because PepsiCo, with an 88.2% interest in Wilson prior to the tender offers, had a large enough percentage of the Wilson stock to execute a merger without conducting the tender offers. Thus, defendants argue, whatever injury plaintiffs claim to have suffered could not have been caused by any securities laws violations connected with the tender offers.

In the case of a tender offer, the concept of causation is somewhat complex. A plaintiff must prove not only that a defendant's misstatements or omissions caused shareholders to accept the tender offer ("transaction causation"), but also that the violations caused the injuries of which the plaintiff complains ("loss causation"). *See, e. g., Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); 1 *Bromberg, supra* § 4.7(551).[31] When the tender offer is conducted by a controlling shareholder, and is followed by a merger, the chain of causation becomes even more complex.

The concept of transaction causation often is equated to the requirement that plaintiffs in a section 10(b) action have relied on a material deception in selling their shares. *See,* 3 *Bromberg, supra,* § 8.7(1) at 216. The Supreme Court has held that,

28. In fact, it seems possible that the announcements raised the market price of Wilson above what it would normally be. Counsel for both plaintiffs and defendants conceded at oral argument that they were not sure how the announcements had affected the price of Wilson shares. In light of uncertainty as to the nature of the effect on the market price of Wilson, it might have been misleading for defendants to make any statement about that effect in the tender materials.

29. To the extent that plaintiffs are complaining that defendants did not reveal the "unfairness" of their actions in making the announcements, or did not attach a pejorative label to their actions, they cannot state a claim under section 10(b). *See,* the discussion of *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), and subsequent cases, *infra* at Section IV.

Defendants urge that even if each of the omissions alleged by plaintiffs was found to be material, there could be no liability, because none of the omissions is "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading", as required by the language of rule 10b–5. *See,* note 19, *supra.* As to the omission of reference to appraisal rights, this question has already been determined in favor of plaintiffs at note 19, *supra.* The Court has concluded that the question of the materiality of several of the other omissions must be left for decision by the trier of fact. As to these omissions the Court is unable to determine on a

motion for summary judgment whether the facts omitted were or were not "necessary in order to make the statements made [in the tender materials] . . . not misleading". This question, like that of materiality, appears to be one of mixed law and fact requiring the drawing of inferences and evaluation of how a reasonable shareholder might be misled. Thus, it is a question which is more appropriate for the trier of fact to decide.

30. The discussion in this section is addressed only to those plaintiffs who are holders of common shares. It is unclear whether plaintiffs allege that omission of reference to appraisal rights, which the Court has held to be material as a matter of law, was a violation which affected the warrant holders and debenture holders. Furthermore, it is unclear what types of injuries the warrant holders and debenture holders are alleged to have suffered as a result of the omissions from the tender materials. Consideration of causation as to the warrant holders and debenture holders is postponed until the parties have had the opportunity to develop further their theories and the facts, with particular reference to the various omissions and the holders of different classes of securities.

31. Justice Blackmun has noted the complex nature of causation in a tender offer case. *See, Piper v. Chris-Craft Industries,* 430 U.S. 1, 51, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) (Blackmun, J., concurring).

once materiality has been established, positive proof of reliance is unnecessary. In *Mills v. Electric Auto-Lite*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), the Court stated:

"Where the misstatement or omission in a proxy statement has been shown to be 'material' . . . that determination itself indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote."

*Id.* at 384, 90 S.Ct. at 621. The Court concluded that a plaintiff would not be required to prove that the defect actually had a decisive effect on the voting. The Court expanded on this holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972):

"Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. . . . This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact."

*Id.* at 153–154, 92 S.Ct. at 1472.

■■■■■ The burden of proving nonreliance in the case of omissions rests on defendants. *See, Thomas v. Duralite Co., Inc.*, 524 F.2d 577, 585 (3d Cir. 1975); *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974). The defendants in this case have made some general suggestions

that plaintiffs, especially those who failed to tender their shares, could not have relied on the omissions in the tender materials. However, they have presented no specific evidence to show that those shareholders who tendered did not rely on the omissions. The Court believes that *Mills* and *Affiliated Ute* dictate the conclusion that reliance may be presumed in this case.[32]

Defendants argue that even if it is assumed that shareholders relied on the omissions from the tender materials and that the tender offers would not have succeeded but for the omissions, the plaintiffs still cannot prove a causal connection between the alleged violations and the injuries suffered by the shareholders. This is because PepsiCo could have executed the merger without successful tender offers, or without any tender offers at all, and all minority shareholders would have been forced to surrender their shares at the time of the merger. Defendants argue that when a parent corporation owns enough shares prior to a tender offer to assure approval of a merger with a subsidiary, there can be no showing of a causal relationship, because the tender offer is not an "essential link in the accomplishment of the transaction." *See, Mills v. Electric Auto-Lite, supra*, 396 U.S. at 385, 90 S.Ct. at 622.[33]

■■■ As to the shareholders who elected to accept the tender offer, defendants' argument is faulty. As a result of their acceptance, those shareholders lost at least their right to obtain an appraisal at the time of the subsequent merger. This loss would not have occurred if PepsiCo had executed a merger without a prior tender offer.

---

**32.** It is unnecessary for the nontendering shareholders to demonstrate that they relied on the omissions, so long as they claim injury resulting from the reliance of the tendering shareholders. *See, Vine v. Beneficial Finance Co., supra*, 374 F.2d at 635; Note, The Reliance Requirement in Private Actions Under SEC Rule 10b–5, 88 *Harv.L.Rev.* 584, 593 (1975). *See also, Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 269 (3d Cir.), *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972).

Defendants' allegations that plaintiffs were presumably aware of disclosed corporate infor-

mation have been discussed under the headings in Section III B, *supra*.

**33.** In *Mills*, the Court stated:

"Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."

*Id.* at 385, 90 S.Ct. at 622.

As to the nontendering shareholders, the chain of causation is not so clear.[34] However, a number of courts have adopted a liberal approach to causation in cases similar to the present one. In *Mills*, the Supreme Court suggested the possibility of such a liberal approach in the case of a proxy solicitation followed by a merger. The Court stated:

"We need not decide in this case whether causation could be shown where the management controls a sufficient number of shares to approve the transaction without any votes from the minority. Even in that situation, if the management finds it necessary for legal or practical reasons to solicit proxies from minority shareholders, at least one court has held that the proxy solicitation might be sufficiently related to the merger to satisfy the causation requirement . . ."

*Id.*, 396 U.S. at 385 n. 7, 90 S.Ct. at 622.

In *Evmar Oil Corp. v. Getty Oil Co.*, Fed.Sec.L.Rep. (CCH) ¶ 96,358 (C.D.Cal., March 17, 1977), the court considered alleged omissions from a proxy statement seeking shareholder approval of a merger. The court concluded that the fact that Getty controlled sufficient votes to assure the needed shareholder approval of the merger transaction, standing alone, did not demonstrate that the proxy statement was not an "essential link" in the accomplishment of the transaction. The court concluded that the question of causation in that case was a question of fact to be resolved at trial.

In *Voege v. American Sumatra Tobacco Corp.*, 241 F.Supp. 369 (D.Del.1965), on a motion to dismiss, Judge Steel considered the causal relationship between fraud in connection with a tender offer and injury to a minority shareholder occurring as a result of a subsequent short form merger. Prior to the tender offer, the majority shareholder owned more than 50% but less than 90% of the common stock, and presumably could have executed a merger by virtue of its majority position. As a result of the tender offer, the majority shareholder obtained more than 90% of the stock and thus was able to execute a short form merger. Judge Steel discounted the argument that there was no causation, concluding that the alleged fraud in the tender offer culminated in the merger under which the plaintiff became obligated to sell her stock at an allegedly insufficient price.

In other cases relating to the use of proxy statements, when controlling shareholders possess enough votes to execute transactions without the proxies, courts have been willing to assume that the proxy statements might have served a purpose and that an accurate proxy statement could have produced a different transactional result. *See, e. g., Cole v. Schenley Industries, Inc.*, 563 F.2d 35 (2d Cir. 1977) (accurate disclosure could have produced threat of massive election of appraisal rights or suit for injunction, which might have prevented merger); *Schlick v. Penn-Dixie Cement Corp., supra*, 507 F.2d 374 (causation sufficiently alleged even when majority shareholder could have voted to proceed with merger, irrespective of misstatements or omissions in proxy statement); *Swanson v. American Consumer Industries, Inc.*, 415 F.2d 1326, 1332 (7th Cir. 1969) ("We are not prepared to sanction a rule of causation which would presume that full disclosure to minority shareholders could have no transactional function in corporate affairs"); *Globus, Inc. v. Jaroff*, 271 F.Supp. 378, 381 (S.D.N.Y.1967) ("If the majority is required to reveal all the facts, including those which may harm minority interests, it may decide to forego a vote. In any event, with full disclosure the minority is in a better position to protect its interests"); *Laurenzano v. Einbender*, 264 F.Supp. 356 (E.D.N.Y.1966) (unfavorable vote from minority shareholders might have caused modification of transaction). Several commentators have advocated a liberal approach to causation in cases involving a controlling shareholder, noting that disclosure may have functions beyond obtaining

---

**34.** The chain of causation may also be somewhat unclear as to any injuries the tendering shareholders might allege, other than the loss of appraisal rights. As indicated in the text, *infra*, plaintiffs have not specified clearly what types of injuries they allege.

the informed vote of a certain percentage of the shareholders. *See*, 1 *Bromberg, supra*, § 4.7(556) at 86.22–86.25; Note, Causation and Liability in Private Actions for Proxy Violations, 80 *Yale L.J.* 107 (1970).[35]

The Court concludes that the liberal approach to causation is the proper one to apply in this case. However, the question of causation is a close one, and the Court cannot determine with certainty whether or not there was a causal relationship between any violations in the tender materials and any injury suffered by the nontendering shareholders.[36] Causation is a question of fact and should be left for decision by the trier of fact. *See, e. g., J. I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Swanson, supra*, 415 F.2d at 1332; *Evmar Oil Corp., supra*, Fed. Sec.L.Rep. (CCH) ¶ 96,232. Furthermore, the briefing of the parties has not identified clearly the nature of the injuries plaintiffs claim to have suffered.[37]

**35.** The cases which defendants cite to support their argument that causation is lacking in the present case are not persuasive. In several of these cases, the courts have concluded that there was no causal connection between nondisclosure of certain transactions or intentions in a proxy statement for re-election of directors, and subsequent actions taken by those directors. *See, e. g., Halle & Stieglitz, supra*, 442 F.Supp. at 223–225; *Ketchum v. Green*, 415 F.Supp. 1367 (W.D.Pa.1976), *aff'd.*, 557 F.2d 1022 (3d Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977). Even though adequate disclosure could have led to the defeat of the directors, the courts concluded that the directors could have taken the same actions prior to their re-election and that there was no connection between the nondisclosures and the actions taken. However, the present case is distinguishable, since the tender offers were a significant transactional step in PepsiCo's acquisition of 100% of the Wilson shares. To the extent that other cases cited by the defendants are analogous to the present case, the Court concludes that the liberal approach to causation taken in the cases discussed in the text represents the better view.

**36.** There may be theories on which plaintiff could prove causation. For example, defendants' counsel suggested at oral argument that PepsiCo may have decided to conduct a tender offer for the common shares (as opposed to further open market purchases of Wilson stock) for the reason that it provided a means

### D. Scienter

Defendants argue that they cannot be held liable under section 10(b) because plaintiffs have not shown culpability, or scienter. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that a private cause of action for damages under section 10(b) and rule 10b–5 will not lie in the absence of an allegation of scienter— "intent to deceive, manipulate, or defraud". The Court concluded that the use of the terms "manipulative or deceptive" and "device or contrivance" in section 10(b) suggests that the provision "was intended to proscribe knowing or intentional misconduct". *Id.* at 197, 96 S.Ct. at 1383. The Court held that an allegation of mere negligence will not support a cause of action under section 10(b). However, the Court left open the possibility that reckless behavior might be sufficient for civil liability under section 10(b).[38]

for testing the fairness or acceptability of the $17.50 per share price. *See*, Transcript, p. 74. Assuming plaintiffs allege the inadequacy of the $17.50 price, this reasoning could supply a causal connection between tender offer violations and alleged injury. Full disclosure might have produced an incentive for PepsiCo to raise the price offered, due to failure of the tender offer or direct shareholder pressure. In addition, the obligation to disclose could have led PepsiCo to forego the tender offer and merger altogether. However, the Court cannot be certain that these possibilities would convince a jury.

**37.** In any statements concerning causation, the Court intends no comment on whether plaintiffs will be able eventually to prove measurable damages in connection with their alleged injuries.

**38.** In a footnote, the Court stated:
"In this opinion the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud. In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5."
425 U.S. at 194 n. 12, 96 S.Ct. at 1381.

At the present time, the Third Circuit appears to recognize both "reckless" conduct and "knowing" conduct, as well as actual intent to defraud, as sufficient standards for scienter in a section 10(b) action. The record in this case does not indicate that there was a clear intent to defraud minority shareholders on the part of defendants. The alternative standards of "reckless" conduct and "knowing" conduct will be discussed in turn.

In a recent post-*Hochfelder* decision, *Coleco Industries, Inc. v. Berman*, 567 F.2d 569 (3d Cir. 1977), the Third Circuit joined other courts in concluding that a finding of recklessness may give rise to liability under section 10(b) and rule 10b–5.[39] Prior to *Coleco*, this District had arrived at the same conclusion. *See, McLean v. Alexander*, 420 F.Supp. 1057 (D.Del.1976). Under *Coleco* and *McLean*, the defendants in the present case could be held liable if they are shown to have behaved recklessly in omitting material facts from the tender offer materials.[40]

In *Coleco*, the Court found it unnecessary in the context of the case to define precisely the term "recklessness", since it concluded that the conduct of the defendants could not be termed reckless under any of the standards which other courts had suggested. The Seventh Circuit has articulated a standard for reckless behavior in connection with omissions in several post-*Hochfelder* cases. In *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977), the Court, quoting from *Franke v. Midwestern Oklahoma Development Authority*, 428 F.Supp. 719 (W.D.Okl. 1976), stated:

> "reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

*Sundstrand, supra* at 1045. The court in *Sundstrand* went on to state that not only must the danger of misleading buyers be actually known or so obvious that any man

---

**39.** The Second, Seventh, and Ninth Circuits have concluded that a showing of reckless behavior is sufficient to meet the scienter requirement of section 10(b) and rule 10b–5. *See, e. g., Nelson v. Serwold*, 576 F.2d 1332 (9th Cir. 1978); *Rolf v. Blyth, Eastman, Dillon & Co., Inc.*, 570 F.2d 38 (2d Cir. 1978); cases cited in *Coleco, supra*, 567 F.2d at 574 n. 6. *See also, McLean v. Alexander*, 420 F.Supp. 1057 (D.Del. 1976). A number of post-*Hochfelder* commentators have urged that a recklessness standard for scienter is appropriate. *See, e. g.*, Bucklo, The Supreme Court Attempts to Define Scienter Under Rule 10b–5; *Ernst & Ernst v. Hochfelder*, 29 *Stanford L.Rev.* 213 (1977); Haimoff, Holmes Looks at *Hochfelder* and 10b–5, 32 *Bus.Law.*, 147 (1976); 2 *J.Corp.L.* 389 (1977); 8 *Rutgers-Camden L.J.* 325 (1977).

**40.** Defendants argue that the Court should require a showing of actual intent to defraud, rather than mere recklessness, in the present case. They argue that *Coleco* and *McLean* should be read narrowly and should be confined to their facts. Defendants allege that both cases involved primarily misrepresentations, rather than omissions. They further assert that any omissions in the present case were by no means so flagrant as the omissions and misrepresentations considered in *McLean*. Defendants suggest that, while a recklessness standard may suffice in the case of a face-to-face transaction, a strict standard of scienter is more appropriate in the case of omissions from a tender offer, which may result in liability to a vast number of investors.

The Court concludes that a recklessness standard is appropriate in the present case. Other Circuits have applied the standard to omissions as well as misrepresentations. *See, e. g., Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). In the present case, the Court has found as a matter of law that the omission of any mention of appraisal rights was the omission of a material fact. *See, supra*, Section III B 1. While many of the cases which have considered scienter since *Hochfelder* have involved face-to-face transactions, including *Coleco* and *McLean*, several have involved impersonal transactions. *See, e. g., Sanders v. John Nuveen & Co., Inc.*, 554 F.2d 790 (7th Cir. 1977) (commercial paper issue); *Franke v. Midwestern Oklahoma Development Authority*, 428 F.Supp. 719 (W.D.Okl. 1976) (bond issue). The language of the cases which adopt a recklessness standard does not suggest that it is inappropriate to apply such a standard to impersonal transactions such as tender offers.

would be legally bound as knowing, but the omission must derive from something more egregious than even "white heart/empty head" good faith. The Court labeled the first part of this standard as an "objective" test, and the second part as a "subjective" test. In *Sanders v. John Nuveen & Co., Inc.,* 554 F.2d 790 (7th Cir. 1977), the court applied the *Sundstrand-Franke* test, but noted that "the definition of 'reckless behavior' should not be a liberal one", and that recklessness should be closer to intent than to negligence. *Id.* at 793.[41]

Plaintiffs argue that the evidence in the record proves that the defendants in this case acted recklessly in omitting material facts from the tender materials. There appears to be no direct evidence in the record that defendants had actual knowledge that nondisclosure of the information omitted, including appraisal rights, would mislead shareholders. Plaintiffs argue, however, that the omissions in this case presented such an obvious danger of misleading shareholders that defendants may be said to have acted recklessly. Plaintiffs also cite Pepsi-Co's domination of Wilson and its knowledge of the items omitted in support of their claim.

██ However, the Court believes that it cannot hold as a matter of law that defendants' behavior in this case was reckless. The findings which must be made under the *Sundstrand* test are particularly suited for decision by the trier of fact. Whether an omission is "highly unreasonable", and whether an omission presented a danger of misleading investors that was so obvious

that a defendant must have been aware of it, are matters which depend largely on an evaluation of the factual context of a case and an evaluation of what a reasonable person could be expected to do. The record in this case is not so clear on these matters that the Court can find either recklessness or lack of it as a matter of law under the *Sundstrand* test. A jury is particularly suited to make this type of evaluation.[42]

██ However, the Third Circuit has concluded that knowing conduct, as well as reckless conduct, is sufficient to meet the scienter requirement of section 10(b). In a pre-*Hochfelder* case, *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402 (3d Cir. 1974), the Third Circuit concluded that it was unnecessary to decide whether negligence would be sufficient for rule 10b–5 liability in a nondisclosure case, since any scienter requirement was fulfilled by defendant's actual knowledge of the undisclosed information. *Id.* at 407. *Accord, Thomas v. Duralite Co., Inc.,* 524 F.2d 577, 584 (3d Cir. 1975); *Fenstermacher v. Philadelphia National Bank,* 493 F.2d 333, 340 (3d Cir. 1974). In *McLean v. Alexander, supra,* 420 F.Supp. 1057, Judge Schwartz concluded that the *Rochez* standard of actual knowledge is consistent with the holding of *Hochfelder* that section 10(b) was intended to cover knowing or intentional misconduct. He also noted that since the Supreme Court has left undefined the parameters of scienter, the law of the circuit courts should control. Judge Schwartz held that rule 10b–5 liability could be supported on a finding of reckless, knowing, or deliberate conduct.[43] He

---

**41.** The recklessness standard articulated in *Sundstrand* has been applied by other courts. *See, e. g., Nelson v. Serwold,* 576 F.2d 1332 (9th Cir. 1978); *Cook v. Avien, Inc.,* 573 F.2d 685 (1st Cir. 1978).

**42.** While the Court has concluded that information on appraisal rights is material in the circumstances of this case, it does not necessarily follow that omission of that information can be held to be "highly unreasonable", or that the danger of misleading shareholders necessarily must have been obvious to the defendants. The standards for materiality and recklessness are related to some extent, but they are not identical. The question of whether there is a

"substantial likelihood that a reasonable shareholder would consider [an omitted fact] important in deciding how to vote" is not the same question as whether the omission was "highly unreasonable", and whether it presented an obvious danger of misleading shareholders. While the answers to these questions may be the same in some instances, this will not always be the case. In the present case, the Court cannot conclude with certainty that the answers should be the same.

**43.** As Bromberg has noted, the discussion of scienter under section 10(b) has tended to be plagued by semantic confusion as a result of the failure to separate quite different kinds of

concluded that an accountant's actual knowledge of material facts which he failed to disclose in his opinion audit was sufficient to constitute knowing misconduct, and thus would sustain a finding of liability.[44] *See also, Monsen v. Consolidated Dressed Beef Co., Inc.,* 579 F.2d 793 at 802–803 (3d Cir., 1978). *Cf.,* 2 *J. Corp.L.* 389 (1977). This Court believes that, in light of the holdings of *Rochez* and *McLean,* it is bound to apply the standard of actual knowledge in this case.[45]

Undisputed facts in the record establish that officers, directors, and employees of PepsiCo and Wilson had actual knowledge of the existence of appraisal rights. In 1970, the Boards of Directors of both PepsiCo and Wilson approved a merger proposal which included the statement that dissenting shareholders would have a right to appraisal and would be paid in cash.[46] An alternative merger proposal, described in memoranda addressed to two of the individual defendants in this case, included the statement that Wilson minority shareholders would receive PepsiCo stock or appraisal rights.[47] At the PepsiCo Board meeting of July 26, 1972, the tender materials were presented to the meeting by management, and the resolutions which were unanimously adopted made reference to the materials.[48] At the same meeting, the Board

members viewed a slide presentation entitled "Proposal for Elimination of All Wilson Outstanding Securities by PepsiCo and/or Wilson Immediately", which contained references to planned disposition of the remaining outstanding common stock by statutory merger.[49] On July 26, 1972, the Wilson Board approved the tender materials for the debentures.[50] On July 31, 1972, while the tender offers were outstanding, Mr. Schaefer, a director of PepsiCo and Wilson, and an Executive Vice President of PepsiCo, informed a warrant holder that the company thought the tender was fair and that "we are prepared to support same in any right of appraisal".[51] On August 16, 1972, two days after the tender offers expired, a proposed merger timetable which referred to a date on which to "determine rights of minority stockholders, evaluate appraisal rights of Wilson and minority stockholders . . .", was circulated to members of PepsiCo management.[52]

Based on these portions of the record, the Court concludes that PepsiCo and Wilson, through at least some of their officers and directors, had actual knowledge of the existence of appraisal rights at the time when the tender offer materials were issued and outstanding, and knew that this information was not contained in the tender materi-

criteria—knowledge criteria, state of mind criteria, and care criteria. 3 *Bromberg, supra,* § 8.4(504) at 204.102. Judge Schwartz's analysis in *McLean* clearly distinguishes the three types of criteria.

**44.** Judge Schwartz further found that, in addition to possessing actual knowledge, the accountant showed a reckless disregard for the truth by pretending to knowledge which he did not have.

**45.** Defendants argue that an "actual knowledge" or "knowing conduct" standard requires not only knowledge of the omitted information, but also knowledge that the information will mislead investors. There is no indication in *Rochez, supra,* that the latter type of knowledge is required. Most securities cases which apply a standard of knowing conduct refer only to knowledge of the omitted information. *See,* 3 *Bromberg, supra,* § 8.4(521) at 204.131.

**46.** *See,* Defendants' Exhibit E IV 1, p. 2 (draft of IRS rulings request by PepsiCo's outside counsel); Plaintiffs' Exhibit 112, p. 4 (request),

Plaintiffs' Exhibit 113, p. 2 (supplemental letter), Defendants' Exhibit E IV 25, p. 2 (letter from IRS to Wilson Sporting Goods); Defendants' Exhibit D I 7 (minutes of PepsiCo Board meeting, April 8, 1970); Defendants' Exhibit A IV 4 (minutes of Wilson Board meeting, April 8, 1970).

**47.** *See,* Plaintiffs' Exhibit 20, p. 3 (memorandum of April 8, 1970); Plaintiffs' Exhibit 114, p. 2 (memorandum of April 23, 1970).

**48.** *See,* Defendants' Exhibit D I 7 (excerpt from minutes of Board meeting, July 26, 1972).

**49.** *See,* Defendants' Exhibit E VI 13.

**50.** *See,* Plaintiffs' Exhibit 151 T (minutes of Wilson Board meeting, July 26, 1972).

**51.** *See,* Plaintiffs' Exhibit 16.

**52.** *See,* Plaintiffs' Exhibit 92.

als. Thus, under *Rochez* and *McLean*, the scienter requirement is fulfilled as to Pepsi-Co and Wilson in connection with nondisclosure of the existence of appraisal rights, since they possessed actual knowledge of the material fact omitted.[53]

## IV. SANTA FE INDUSTRIES

In *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court held that a claim of fraud or breach of fiduciary duty would state a cause of action under section 10(b) only if the conduct alleged could be viewed as "manipulative or deceptive". The court held that a section 10(b) plaintiff must allege some form of misrepresentation or nondisclosure. A claim that shareholders were treated unfairly by a fiduciary, without more, might state a claim under state law, but would not state a claim under the federal securities laws.

The defendants argue strenuously that plaintiffs' claims cannot stand in the face of *Santa Fe*, even though the complaint alleges nondisclosure of material facts in the tender offers. Defendants maintain that the thrust of the complaint is merely an allegation that PepsiCo, the majority shareholder, breached its fiduciary duty to the minority shareholders, and that the prices offered in the tender offer were unfair. Defendants argue that plaintiffs have attempted to "bootstrap" their claims of unfairness into federal claims by framing them as claims of nondisclosure.

Several courts have considered the application of *Santa Fe* to cases, such as the present one, in which plaintiffs have alleged misrepresentations and nondisclosures, as well as unfairness. In *Goldberg v. Meridor*, 567 F.2d 209 (2d Cir. 1977), the Second Circuit considered two press releases issued by a controlling shareholder. The plaintiffs alleged that the transactions described in the press releases were unfair and also that there were material nondisclosures and misstatements in the press releases. The court concluded that the district court was wrong to dismiss the section 10(b) complaint on the authority of *Santa Fe*, since there could be deception of a corporation when it is influenced by its controlling shareholder to engage in a transaction adverse to the corporation's interests *and* there are nondisclosures or misleading disclosures as to the material facts of the transaction. The court stated:

> "[W]e do not read *Green* as ruling that no action lies under Rule 10b–5 when a controlling corporation causes a partly owned subsidiary to sell its securities to the parent in an unfair transaction and fails to make a disclosure or, as can be alleged here, makes a misleading disclosure."

*Id.* at 217–218. However, in a footnote, the court noted that it was not suggesting that rule 10b–5 requires insiders to characterize conflict of interest transactions with pejorative nouns or adjectives. Rather, it emphasized that the alleged omissions of certain *facts* concerning the weak financial condition of the acquired company would be seriously misleading. *Id.* at 218 n. 8.

In *Goldberger v. Baker*, 442 F.Supp. 659 (S.D.N.Y.1977), the court dismissed a complaint for failure to state a claim under section 10(b). The plaintiffs had alleged a series of fraudulent transactions accompanied by misleading disclosure or omissions. However, the court concluded that these were merely "bootstrap" allegations of de-

---

**53.** Defendants allege that they acted in good faith in drafting and approving the tender materials. However, as the court in *McLean, supra*, noted, good faith is a defense to a charge of negligent conduct, but not to a charge of knowing or reckless conduct under section 10(b). 420 F.Supp. at 1081. Under section 18(a) of the Securities Exchange Act of 1934, good faith is a defense. However, plaintiffs have not chosen to sue under that provision.

The plaintiffs' summary judgment motion was filed against only the corporate defendants, PepsiCo and Wilson. The Court makes no finding at this time as to whether any of the individual defendants possessed the requisite actual knowledge for liability under section 10(b). Nor does the Court make any findings as to knowledge of omitted facts other than the existence of appraisal rights. Such determinations appear to be more properly left for development at trial.

ception, which the Second Circuit had attempted to forestall in *Meridor*. The court stated:

> "Even under the most narrow reading of *Green*, an allegation of deception must allege more than a mere failure to disclose the 'unfairness' of a transaction."

*Id.* at 664. The court concluded that all of the nondisclosures alleged were merely instances in which the controlling shareholder had failed to disclose that certain transactions were unfair, but that there was no claim that the underlying facts concerning the transactions themselves were not disclosed. In *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078 (2d Cir. 1977), a rule 14a–9 case in which plaintiffs had alleged that certain proxy materials were false and misleading, the court observed that the claims of nondisclosure of conflicts of interest and nondisclosure of the unfairness of a conversion price were in effect claims that state law fiduciary duties had been violated. The court concluded that the claim should be dismissed, since *Santa Fe* had established that federal securities laws did not impose any duty on the directors to deal fairly with debenture holders.

In *Voege v. Magnavox Co.*, 439 F.Supp. 935 (D.Del.1977), the court considered a claim under section 10(b) that a proxy statement contained misrepresentations and nondisclosures concerning the validity and legal effect of a merger. However, the court stated, "For plaintiff to characterize the statements in the Proxy Statement as 'misrepresentations' and 'concealments' does not make them so within the intendment of Rule 10b–5(b)." *Id.* at 941. The court concluded that since the truth of the statements made could not be determined without deciding the legality of certain transactions under state law, determination of the question in connection with a section 10(b) claim would be contrary to the philosophy of *Santa Fe*.

Those post-*Santa Fe* cases suggest that some, but not all, allegations of material misrepresentations and nondisclosures will state a claim under section 10(b). Allegations that a defendant failed to disclose that a transaction was unfair or that it might violate state law will not be sufficient for a section 10(b) action. However, nondisclosure of material facts concerning the transactions themselves generally will be actionable under section 10(b).

Several of the allegations in the complaint in this case make reference to unfairness of the tender offer price or of certain transactions.[54] To the extent that plaintiffs complain of the failure to inform minority shareholders of the unfairness of the price offered or of the actions of PepsiCo, their allegations do not state a claim under section 10(b). However, the complaint also refers to nondisclosure of underlying facts or transactions themselves, such as the existence of appraisal rights and the improved earnings of Wilson. In their briefs, plaintiffs have stressed the failure to disclose the underlying facts, rather than characterizations of defendants' behavior as "unfair". Defendants readily concede that the underlying facts were not disclosed in the tender materials. This case is thus distinguishable from *Goldberger v. Baker, supra*, in which there was no allegation that the underlying transactions themselves were not disclosed. The Court concludes that the allegations of nondisclosure discussed in Section III B, *supra*, are sufficient to meet the requirements of *Santa Fe*.[55]

---

**54.** The Court notes that the complaint was drafted over four years prior to the Supreme Court's decision in *Santa Fe*. The language of the complaint naturally reflects this fact.

**55.** This holding is subject to the reservation concerning nondisclosure of the effects of PepsiCo's prior public announcements, stated in note 29, *supra*. The Court emphasizes that the holding that the complaint states a claim under section 10(b) applies only to the allegations of nondisclosure discussed in Section III B, *supra*. The Court does not reach the adequacy under *Santa Fe* of the allegation that PepsiCo engaged in a scheme to defraud Wilson minority shareholders beginning at the time PepsiCo acquired LTV's interest in Wilson. *See infra* at Section VI.

## V. PENDENT STATE LAW CLAIMS

Plaintiffs argue that the alleged omissions from the tender offer materials constitute violations of Delaware law, as well as violations of section 10(b). They point out that under Delaware law a majority shareholder owes a fiduciary duty to minority shareholders. *See, Epstein v. Celotex Corp.*, 43 Del.Ch. 504, 238 A.2d 843 (1968); *Allied Chemical & Dye Corp. v. Steel & Tube Co.*, 14 Del.Ch. 1, 120 A. 486 (1923). Plaintiffs cite *Lynch v. Vickers Energy Corp.*, 383 A.2d 278 (Del.1977), for the proposition that a majority shareholder which extends a tender offer owes the duty of "complete candor" to minority shareholders and must disclose all information which is "germane" to the transaction at issue. They argue that the facts omitted from the tender materials in this case constitute germane information which defendants were obliged to disclose under the "complete candor" standard of *Lynch*.

 In order for this Court to have the power to exercise pendent jurisdiction over plaintiffs' state law claims, there must be an underlying federal claim which is substantial enough to support subject matter jurisdiction, and the state and federal claims must derive from a "common nucleus of operative fact". *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Hayes v. City of Wilmington*, 451 F.Supp. 696 at 716 (D.Del., May 26, 1978). As the prior sections of this opinion indicate, the plaintiffs' allegations of omissions from the tender materials state a substantial claim under the federal securities laws. Furthermore, those state law claims which concern the adequacy of disclosure in the tender offer materials are addressed to the same "nucleus of operative fact" as the federal claims addressed earlier in this opinion. Thus, it would appear that this Court has the power to hear the state law claims concerning the adequacy of disclosure in the tender materials.[56]

However, it is unnecessary to decide the question of the Court's power at this time, since pendent jurisdiction need not be exercised in all cases in which a federal court has the power to exercise it. The Supreme Court has stated that pendent jurisdiction "is a doctrine of discretion, not of plaintiff's right". *United Mine Workers, supra*, 383 U.S. at 726, 86 S.Ct. at 1139. The doctrine is justified by considerations of judicial economy, convenience, and fairness. *Id.* "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law". *Id.* If state issues substantially predominate, it may be appropriate to leave the resolution of the state law claims to state tribunals. *Id.* at 726–27, 86 S.Ct. 1130.

The question whether it is proper to assume pendent jurisdiction is one which remains open throughout the litigation. *United Mine Workers, supra* at 727, 86 S.Ct. 1130; *General Foods Corp. v. Struthers Scientific and International Corp.*, 297 F.Supp. 271, 277 (D.Del.1969). The Court has concluded earlier in this opinion that decision of many of the federal issues should be determined at a later time by a jury. Furthermore, *Lynch v. Vickers Energy Corp., supra*, on which plaintiffs rely heavily, issued less than a year ago. Thus, the present case involves a somewhat novel and uncharted area of state law.[57] *See, Aiello v. City of Wilmington*, 426 F.Supp. 1272,

---

**56.** The Court makes no observation at this time as to whether any alleged breaches of fiduciary duty, other than those concerning omissions from the tender materials, could or should be considered within the pendent jurisdiction of this Court. *See*, Section VI, *supra.*

**57.** Subsequent case law has suggested, but not clarified, the relationship between the standards for disclosure under the federal securities laws and the standards for disclosure established by *Lynch*. *See, e. g., In re TransOcean Tender Offer Securities Litigation*, 427 F.Supp. 1211, 1220 (N.D.Ill.1977); *Kaplan v. Goldsamt*, 380 A.2d 556, 565–566 (Del.Ch.1977). Furthermore, some issues, such as the availability of a good faith reliance defense for individual defendants, remain to be decided in the *Lynch* case. *See, Lynch v. Vickers Energy Corp.*, Civ. A.No. 4645 (Del.Ch., May 12, 1978) (judgment reserved on motion to dismiss as to individual defendants).

# 1256

1295 (D.Del.1976). These factors suggest that it would be preferable to avoid any premature decision on the state law claims themselves or the propriety of entertaining them. The Court concludes that the matter of whether in its discretion it should exercise the power to assume pendent jurisdiction should be determined at a later time.[58]

## VI. ADDITIONAL CLAIMS

A number of the claims alleged in the complaint have not been briefed. Thus, the Court concludes that it would be inappropriate to rule on them at this time. The Court notes that in order to sustain their claim of stock manipulation in violation of section 9 of the Securities Exchange Act of 1934, the plaintiffs apparently will be required to present evidence that defendants had the *purpose* of inducing sale of the stock or pegging the price of the stock. *See*, 2 *Bromberg* § 7.1 at 144 n. 16. Plaintiffs allege that defendants violated section 10(b) and rule 10b–5, not only in omitting information from the tender materials, but also by a continuing course of fraudulent conduct between the time PepsiCo acquired the majority interest in Wilson and the time of the merger. The Court has considerable doubt whether such a claim can withstand the holding of *Santa Fe Industries, supra.* Furthermore, if the Court should dismiss the section 10(b) claims covering the defendants' continuous conduct over this period, it may be proper to dismiss any pendent claims of breach of fiduciary duty under state law, based on the same conduct. *See, United Mine Workers, supra*, 383 U.S. at 726, 86 S.Ct. 1130. However, any decision on these matters will await further briefing by the parties.

In summary, the "in connection with" requirement is met in this case, except as to the nontendering debenture holders. As a matter of law, the omission of reference to appraisal rights in the subsequent merger is a material omission. As to this omission, the causation requirement is met by the tendering shareholders. The scienter requirement is met as to PepsiCo and Wilson, due to actual knowledge of the availability of appraisal rights. As a matter of law, the omission of any reference to the redemption price for the debentures and the omission of the earnings per share figures are not material. The remaining questions will be left for decision at the time of trial, including the materiality of the remaining omissions, the existence of scienter in connection with those omissions, and causation as to the nontendering shareholders.

---

58. *Cf. State of Delaware v. Pennsylvania, New York Central Transportation Co.*, 323 F.Supp. 487, 496 (D.Del.1971).